FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D N.Y

★ APR 3 0 2010 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GERARD DEPASCALE, LIAM NEVILLE
AND JOANNE DEPASCALE,

        Plaintiffs,

  -against-

SYLVANIA ELECTRIC PRODUCTS,
INC., et al.,

        Defendants.
------------------------------------------------------------X

MEMORANDUM AND ORDER

CV 07-3558

(Wexler, J.)

APPEARANCES:

  GONZALEZ & ROBINSON, PC
  BY: JOSEPH D. GONZALEZ, ESQ.
      KEITH A. ROBINSON, ESQ.
  Attorneys for Plaintiffs
  2801 Townsgate Road, Suite 111
  Westlake Village CA 91361

  THE MARASCO LAW FIRM
  BY: PAUL A. MARASCO, ESQ.
  Attorneys for Plaintiffs
  1328 Bay Shore Boulevard
  Rochester, NY 14609

  PAUL, HASTINGS, JANOFSKY & WALKER LLP
  BY: NED N. ISOKAWA, ESQ.
      JOHN P. PHILLIPS, ESQ.
  Attorneys for Defendants
  55 Second Street
  San Francisco, CA 94105

  KIRKLAND & ELLIS LLP
  BY: WILLIAM H. PRATT, ESQ.
     FRANK HOLOZUBIEC, ESQ.
     ANDREW G. HORNE, ESQ.
  Attorneys for Defendants

1

Citigroup Center
153 East 53rd Street
New York, NY 10022

ROBERT L. FOLKS & ASSOCIATES, LLP
BY: ROBERT L. FOLKS, ESQ.
Attorneys for Defendants
510 Broad Hollow Road, Suite 304-A
Melville, NY 11747

WEXLER, District Judge

In this negligence action Plaintiffs sought damages for injuries alleged to have been caused by exposure to certain non-nuclear chemicals and solvents. The exposure was alleged to have taken place while Plaintiffs Gerard DePascale and Liam Neville were employed at a site that, years before their employment, was used as a nuclear rod manufacturing facility (the "Site"). Plaintiff Joanne Depascale sought damages for loss of her husband's services.

Defendant Verizon is the company with successor liability of the company that did business at the Site during the manufacture of nuclear fuel rods. Although there are several different corporate entities named as Defendants, the court referred at trial, and will refer herein to Defendants simply as "Defendant."[1]

A jury trial has been held, and a verdict entered in favor of Plaintiffs in the aggregate sum of $12 million. Presently before the court is Defendant's post-trial motion, pursuant to Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law, or in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

---

[1] Consistent with this approach, the court instructed the jury, with the agreement of the parties, that they were not to preoccupy themselves with the corporate relationship among the named Defendants. Instead, they were instructed to consider all Defendants as a single corporate entity.

Defendant's motions argue that judgment as a matter of law and/or a new trial is warranted because: (1) Plaintiffs failed to introduce sufficient evidence of specific causation; (2) Plaintiffs failed to introduce sufficient evidence of general causation; (3) Plaintiffs failed to introduce sufficient evidence of a breach of the standard of care and, (4) Defendant proved, by overwhelming evidence, every element of an affirmative defense, entitling it to judgment as a matter of law and/or a new trial. The first three grounds argued in support of the motion are addressed to the quality of the parties' expert testimony, and the issue of negligence. The fourth addresses the question of whether the evidence compelled only a single reasonable conclusion regarding whether Defendant should have prevailed with respect to the affirmative defense known as the "government contractor defense." After outlining relevant background, legal standards, and testimony the court will decide the merits of the motion

## BACKGROUND

I. <u>The Plaintiffs' Claims</u>

From the early 1990's until approximately 2002, Plaintiffs Gerard Depascale ("Depascale") and Liam Neville ("Neville") were employed by a company, not a defendant here, known as Magazine Distributors. Plaintiff Joanne Despacale is the wife of Plaintiff Gerard Depascale. Magazine Distributors was located on property, referred to herein as the Site, that was used from approximately 1952 though 1967 for the production, handling and storage of nuclear fuel rods. Defendant, as noted, is the company with successor liability to the company that operated at the Site in connection with the nuclear fuel rod business. The court refers herein to that company as "Sylvania."

At trial, Depascale and Neville testified about their experiences while working at the Site.

Plaintiffs' expert witnesses testified that Plaintiffs' exposure to perchloroethylene ("PCE"), trichloroethylene ("TCE") and nickel caused them to develop cancer. Gerard Depascale's trial position was that his exposure to PCE and TCE caused him to develop a type of cancer known as extraskeletal myxoid chondrosarcoma ("EMC"). Neville's position was that his exposure to PCE, TCE and nickel caused him to develop a kidney disease known as membranous nephropathy ("MN").

II.     The Charge, The Verdict Sheet and The Verdict

   A.     Negligence Charge

The jury was instructed as to the elements of a claim of negligence, i.e., negligence, proximate cause and damages. As to proximate cause, the jury was instructed as to the requirements of finding both general and specific causation. Thus, the jury was charged that liability could be imposed only if they found, by a preponderance of the evidence, and separately as to each Plaintiff who worked at the Site: (1) that the exposure they found was capable of causing – i.e. was capable of being a substantial factor in bringing about – the specific illness suffered by each Plaintiff, and; (2) that such exposure was a specific cause, i.e. – that the exposure of each Plaintiff was a substantial factor in bringing about – the specific illness suffered by each Plaintiff.

   B.     Government Contractor Charge

The court instructed the jury as to the elements of the government contractor defense, as set out in Second Circuit precedent, and in the motion for summary judgment herein. See, e.g., Brinson v. Raytheon Co., 571 F.3d 1348, 1351 (2d Cir. 2009); In re Agent Orange Litigation, 517 F.3d 76, 88 (2d Cir. 2008). Thus, the jury was instructed that for the defense to apply, they

would have to find that the Defendant proved, by a preponderance of the evidence that:

- the government (in this case the Atomic Energy Commission) approved reasonably precise specifications for the work to be done at the site;

- that the work done conformed to those specifications; and

- that Defendant (Verizon's predecessor, Sylvania) warned the government of dangers of carrying out the contract that were known to Sylvania, but not known to the government.

The jury was charged that the defense would be considered only if liability was found to exist with respect to one or both of the Plaintiffs who worked at the site. Upon finding such liability, the jury was instructed to consider whether the defense applied.

C. <u>The Verdict Sheet and the Verdict</u>

As to the negligence issue, the court offered to present the jury with specific interrogatories that would have questioned jurors as to their findings regarding each form of causation. Thus, the court was prepared to pose special interrogatories to the jury on the issues of general and specific causation. The parties requested, however, and the court therefore agreed, to submit to the jury a general verdict sheet that asked simply, whether "Defendant was liable to," each Plaintiff. The jury answered "yes," as to each Plaintiff, and awarded an aggregate sum of $12 million to the three named Plaintiffs.

Similarly, the court offered to charge the jury to answer specific interrogatories as to each element of the government contractor defense. That offer was rejected, and the parties agreed to a single interrogatory, asking the jury to respond "yes," or "no," to the question, "Did Defendant establish its entitlement to the government contractor defense?" The jury responded, "No."

The jury's finding of negligence, coupled with its rejection of the government contractor

5

defense led to their consideration of damages. That consideration resulted, as noted above, in a verdict in favor of Plaintiffs in the aggregate amount of $12 million.

## DISCUSSION

I. <u>Standards on Rule 50 Motion</u>

Rule 50 of the Federal Rules of Civil Procedure provides for entry of judgment as a matter of law where, "a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of the non-moving party as to the claim at issue. Fed. R. Civ. P. 50(a)(1). Where, as here, a defendant moves pursuant to Rule 50(a) for judgment as a matter of law at the close of plaintiff's case, and that motion is denied, the defendant may renew the motion pursuant to Rule 50(b). Whether considered pursuant to Rule 50(a) or 50(b), the legal standard to be applied is the same. The motion is properly granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find" in that party's favor. <u>Galdieri-Ambrosini v. National Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d. Cir. 1998); <u>Green v. Groneman</u>, 634 F. Supp.2d 274, 284 (E.D.N.Y. 2009); see <u>Weisgram v. Marley Co.</u>, 528 U.S. 440, 448 (2000) (judgment as a matter of law should be granted "when the facts are sufficiently clear that the law requires a particular result").

The standard for granting a Rule 50 motion is high. The court is required to consider the evidence in the light most favorable to the party against whom the motion is made, and to give that party the benefit of all reasonable inferences that the jury might have drawn in that party's favor from the evidence. The court cannot assess the weight of the evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. <u>LeBlanc-Sternberg v. Fletcher</u>, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted). A motion for judgment as a matter

6

of law can only be properly granted where, "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonably and fair minded men could not arrive at a verdict" against the movant. Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000.

II.   Disposition of the Motion for Judgment as a Matter of Law

   A.   The Expert Testimony Was Sufficient to Support the Jury Verdict on Causation

Much of the trial was devoted to expert testimony. Plaintiffs offered the expert testimony of Drs. Wells, Everett, Thrasher and Johanning.[2] Dr. Wells holds a Ph.D in geology and Dr. Everett holds a Ph.D in hydrology. Dr. Thrasher is a toxicologist, and Dr. Johanning is an M.D. Drs. Wells and Everett testified on the issue of exposure, and Drs. Thrasher and Johanning testified as to medical causation with respect to Plaintiffs' different illnesses. Defendant offered the expert opinion testimony of Drs. Machado and Rodricks as to exposure. On the issues of medical causation, Defendants offered the expert medical testimony of Drs. Fletcher and Goldfarb.

Needless to say, the experts expressed different opinions on behalf of their clients. While Plaintiffs' experts opined that the diseases at issue were caused by Plaintiffs' exposures, Defendant's experts testified as to a complete lack of evidence as to the Plaintiffs' actual exposures. They also opined as to lack of scientific evidence linking such exposures to either of Plaintiffs' illnesses. Upon review of the testimony, the court cannot help but note that Drs.

---

[2]   The court denied pretrial motions to exclude Plaintiffs' expert witnesses pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Fletcher and Goldfarb were far more experienced in the particular fields at issue than Plaintiffs' medical experts. Dr. Fletcher is a world-renowned expert at the Harvard Medical School and the Dana Farber Cancer Institute, whose practice focuses on the particular cancer suffered by Plaintiff Depascale. Similarly, Dr. Goldfarb, the clinical chief of the nephrology department at New York University Medical Center, is a leader in his field, who has personally treated patients who suffer from the precise disease suffered by Plaintiff Neville. Plaintiffs' medical experts had no such similar medical expertise.

The stark differences in the credentials of the experts, however, does not require that this court set aside the jury verdict, and enter judgment on behalf of Defendant. While this court may have found differently than the jury, it cannot say, as a matter of law, that the evidence, when viewed in the light most favorable to Plaintiffs, was insufficient to permit a reasonable juror to find in Plaintiffs' favor. See Goldieri-Ambrosini, 136 F.3d at 289. The court therefore denies to set aside the jury's causation findings.

B. The Evidence Was Sufficient to Support the Jury Verdict as to Standard of Care

The court similarly rejects the argument that the jury reached an unreasonable result when it found that there was a breach of the standard of care. The evidence on this issue was weak, but sufficient to support the jury's verdict as to a breach of the standard of care.

C. The Government Contractor Defense

1. Elements of the Defense

As noted, Defendant raised the government contractor defense, as a complete defense to this action. See generally Boyle v. United Technologies Corp., 487 U.S. 500, 511-12 (1988); In re "Agent Orange" Litigation, 517 F.3d at 88; Isaacson v. Dow Chem. Co., 517 F.3d 129, 132

(2d Cir. 2008). Briefly stated, the defense is one of federal common law that recognizes the necessity of "getting the government's work done," and the concomitant necessity for shielding government contractors from tort liability that might arise in connection with their performance of government work. In re "Agent Orange" Litigation, 517 F.3d at 87, quoting, Boyle, 487 U.S. at 504-05.

The court instructed the jury as to the three elements Defendant was required to prove to be entitled to the defense. The first element, whether the government approved "reasonably precise" specifications for the product, recognizes that for the defense to apply, the government need not specify each and every procedure to be followed when carrying out the project. "It is necessary only that the government approve, rather than create the specifications. . . ." In re "Agent Orange" Litigation, 517 F.3d at 91 (citation omitted). Government approval necessary to invoke the defense is established where there has been "meaningful" review of specifications, such that the approval decision as to those specifications is, in reality, the decision of the government. Id. at 91. The second element of the defense asks whether the contractor complied with the reasonably precise specifications. Finally, the third element investigates whether there were dangers known to the contractor, but not to the government, and whether the contractor advised the government of those dangers. Id. at 98-99.

2. <u>Waiver</u>

Before analyzing the issue of whether the jury could have reasonably rejected the government contractor defense, the court addresses Plaintiffs' argument that Defendant waived the right to raise the defense. The court rejects completely any argument that Defendant waived the right to raise the government contractor defense. The defense was clearly raised, both at the

summary judgment stage, and at trial. The court denied summary judgment on this issue, holding that contract-specific testimony bearing on the defense was necessary to develop before reaching a decision, and that such testimony would be developed at trial. Evidence concerning the defense was developed by both sides, and the court instructed the jury, as described above, as to the findings necessary to support application of the defense.

3. Plaintiffs' Arguments

Plaintiffs set forth two theories to support the jury's rejection of the government contractor defense. First, Plaintiffs argue that there was evidence that Sylvania breached its contract with the government, and that such breach deprives Defendant of taking advantage of the defense. Second, it is argued that there was evidence that not all work done at the Site was performed to fulfill Sylvania's obligations pursuant to its contract with the AEC. In connection with this argument, Plaintiffs argue that there was sufficient trial testimony to establish that Sylvania was operating two parallel operations producing nuclear fuel cells at the same time – one was pursuant to the AEC contract, and the other was pursuant to a non-governmental commercial venture. The presence of the latter venture is alleged to have been considered by the jury in support of their outright rejection of the government contractor defense. More specifically, Plaintiffs argue that there were commercial activities at the Site being conducted in furtherance of Sylvania's private business, which activities used and disposed of the same chemicals found to have injured Plaintiffs. It is further argued that because those commercial activities cannot be separated from those performed in connection with the government contract (in terms of the use and disposal if harmful chemicals), Defendant is not be shielded from liability by assertion of the government contractor defense.

4. The Trial Evidence

Relevant to establishing entitlement to the government contractor defense was the testimony of Harold Cohen, Sylvania's former general counsel, and that of Lee Davenport, a former employee of "Sylcor," a joint venture of Sylvania and Corning – the Sylvania entity that was a party to the contract at issue. For ease of reference the court will refer to the party to the contract as "Sylvania."

Cohen was involved with Sylvania from 1951 through 1960, and testified as to his personal knowledge of the contract at issue. He stated that a contract to conduct research was signed in 1951, with fuel element production following thereafter. Cohen characterized the contract as "one of the most inclusive contracts" that he had ever seen, and that it "covered every aspect of the operation . . . ." He stated that the government controlled all aspects of the work to be performed, including waste disposal. Cohen referred to a particular contractual provision stating that "products, byproducts, wastage, salvage, work in process, residues and scrap" associated with the contract were deemed to be the property of the government, and that the materials used in connection with the contract were all owned by the federal government.

Davenport worked for Sylcor from approximately 1958-1960, and had first hand knowledge of the nuclear fuel business taking place at the Site. Davenport confirmed that the work performed pursuant to the AEC contract involved production of fuel elements that were used in nuclear reactors for the AEC. He testified that the work done consisted of the fabrication of fuel elements of a single type that was "used solely by the federal government . . . ." The fuel elements were items that were not available for general "off the shelf" purchase. Instead, they were manufactured according to particular and detailed AEC specifications for use in connection

with the production of plutonium at a different facility located in another State. Davenport testified that the AEC was involved in "almost every phase of the work" at the Site. He also stated that the final product met the AEC's detailed specifications, including those with respect to the actual production process, and that Sylcor was not at liberty to make any changes to the production process without first consulting with the AEC. Davenport noted the tight governmental controls that existed with respect to the use, storage and disposal of the uranium used at the Site. He testified that AEC personnel monitored implementation of the contractual production process, including the handling of uranium in general, and scrap materials, in particular.

In addition to testifying about the use and handling of uranium – which is not alleged to have caused Plaintiffs' injuries – Davenport also testified regarding the use of the chemical cleaning solvents (PCE and TCE) – which are alleged to have played a part in Plaintiffs' injuries. Davenport testified as to the use of these solvents in cleaning, and the integral nature of that use to the manufacturing process. Specifically, Davenport testified that cleanliness was "a very important aspect of the bonding between the aluminum casing and the uranium itself and that any impurities or anything that got in that interface between the materials would interfere with the cooling rate . . . so cleanliness was very important." Davenport therefore agreed with the statement that these chemical solvent cleaners constituted a "step in the production process," and that the AEC's supervision of the contract at the Site included supervision over the "cleaning of the fuel elements as part of the production process." Davenport also testified that the use of the disposal sump at the Site was discussed with AEC personnel and that its use was an "appropriate technique and approved by the AEC."

In addition to the use of the cleaning solvents alleged to be involved in Plaintiffs' injuries, Davenport testified regarding the use of nickel, also implicated by Plaintiffs in connection with their injuries. As to nickel, Davenport testified that nickel plating was used in the manufacturing process to "assure that the aluminum sleeve on the slug would adhere metallurgically to the uranium inside so that heat transfer could go across that gap."

Both Cohen and Davenport testified as to the issue of whether any activities at the Site were performed in connection with non-governmental work. Cohen testified that while there may have been activity other than the fulfillment of the government contract at the Site, he characterized any such activity as "so small and insignificant" that he could not remember. Cohen stated that 99% of any activity at the site was directed toward fulfillment of the government contract, and that there was absolutely no commercial enterprise conducted at the Site for the manufacture of nuclear fuel elements. Cohen referred to any commercial ventures at the Site as a possibility for the future. Thus, he testified regarding his belief as to negotiations to allow part of the facility to be used for commercial operations, and not as to the realization of those negotiations in the form of actual commercial contracts.

Davenport similarly testified that 99.99% of the work performed at the Site was performed in connection with governmental contracts, with the remainder for "commercial work." Davenport's references to commercial work at the Site referred to that work as work for the future of the company, as well as ongoing operations. Davenport testified with regard to future contracts, and named certain entities as the "type of companies" that "were to be" Sylvania's customers, and did not identify any companies with which Sylvania had contracted. As part their rebuttal case, Plaintiffs offered additional testimony wherein Davenport was asked

13

whether a particular document referred to "the production of nuclear fuel elements for commercial purposes." He responded "[f]or commercial purposes, exactly so." Consistent with earlier testimony, which characterized commercial work as a possibility for the future, Davenport, discussing the need for a "financial man," stated "we were not doing just government contract work and financing. We were going to have commercial work as well . . . ."

While the foregoing testimony can easily be characterized a referring only to the possibility of future commercial work, other testimony, including Davenport's testimony regarding the disposal of waste, tends to indicate that there was ongoing commercial work at the Site. Specifically, Davenport was asked to identify the nuclear materials that were handled, "with respect to the commercial operations" at Sylvania, and responded "commercially handled enriched uranium." He stated that "experimental techniques for producing commercial fuel elements" were conducted at the Site. Again referencing "the commercial work" taking place at the Site, Davenport, indicating that such work was ongoing, testified that commercial work was performed at a different building than the government contract work. When asked to provide a ratio comparing the amount of nuclear material that was processed in connection with government work, to the amount processed in connection with any commercial work, Davenport stated that he could not provide an exact figure, but that they were "significantly different." Davenport was unable to testify with any specificity as to the hours of operation of the commercial building at the Site, or to the number of employees working there.

Finally, Davenport testified as to ongoing commercial work with respect to the disposal of waste generated therewith. When asked about disposal facilities, Davenport stated that there were two separate disposal facilities – one for the government contract, and one for commercial

operations, which he characterized as the start of a new business. Davenport could not testify with any specificity as to when commercial work began at the Site, but did state that such work was "operational," and was "processing material."

5. Disposition of the Motion

The issue on this motion is whether there was sufficient evidence to support a reasonable jury's decision to reject the government contractor defense. The evidence must be construed in the light most favorable to Plaintiffs, and they are entitled to the benefit of all reasonable inferences. While the court is prohibited from "weighing" the evidence, it is permissible, as noted above, to set aside a verdict where, "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonably and fair minded men could not arrive at a verdict" against the movant. Diesel, 232 F.3d at 103.

Turning first to the question of whether evidence of Defendant's breach of the government contract negates the government contractor defense, the court agrees with the general proposition, set forth by Plaintiffs, that failure to conform to government specifications will deprive a contractor from properly asserting the government contractor defense. See In re Agent Orange Litigation, 517 F.3d at 97. In support of their theory of breach here, Plaintiffs argue that Sylvania did not comply with general provisions regarding taking "reasonable steps and precautions to protect health and minimize danger from all hazards to life and property," and the contractor's procurement of necessary permits.

The general contractual statements relied upon by Plaintiffs cannot be properly

15

characterized as contractual specifications within the meaning of the government contractor defense. The defense requires only that the contractor prove compliance with "reasonably precise specifications," approved by the government. Such specifications refer to the manufacture of the product for which the government contracted – in this case – nuclear fuel elements. Sylvania's compliance with those manufacturing specifications is clear. To the extent that Plaintiffs argue that improper disposal of cleaning solvents or other chemicals was a violation of the contract, there is no evidence that any such activity was deemed to be in violation of the contract at issue. To the contrary, the government accepted the finished product and repeatedly extended the contract. The court concludes therefore, that there was no evidence of breach of the government contract that could have been reasonably relied upon to support the jury's rejection of the government contractor defense. Moreover, any argument that such disposal constituted a dangerous activity, any knowledge of such allegedly dangerous procedures would only vitiate the Defense to the extent that it relates to the third element fo the Defense, i.e., if it constituted a danger known to Sylvania, but not to the government. Such knowledge is evaluated as of the time of the carrying out of the contract, and not in hindsight. There was no evidence, and Plaintiffs do not argue, that any dangers known to Sylvania deprived Defendant of asserting the Defense.

Having rejected the notion that breach of contract evidence could have been reasonably relied upon by the jury to reject the government contractor defense, the court turns to consider whether the rejection of the government contractor defense was a reasonable conclusion to reach in light of evidence indicating the presence of a parallel commercial operation, inseparable from the government work, to which the defense could not apply. After combing the record for

evidence to support the jury's decision based on this factual finding, as discussed above, the court concludes that, by the smallest of margins, there was sufficient testimony to support rejection of the defense, and to deny judgment as a matter of law to Defendant.

Davenport testified about future commercial operations, while also testifying about ongoing commercial operations conducted at a separate building that made use of a separate disposal facility. Taken as a whole, however, the jury could have reasonably rejected the government contractor defense based upon its finding of a parallel commercial operation at the Site. While the court would have certainly reached a different conclusion, it cannot be said that the jury's decision was so without reason as to require judgment as a matter of law in favor of Defendant. Accordingly, the court holds that there was sufficient evidence to support the jury's rejection of the government contractor defense.

III.  Disposition of the Motion for a New Trial

In light of the court's denial of the motion for judgment as a matter of law, the court turns to Defendant's alternative request for a new trial. A jury's verdict should "rarely be disturbed," and a new trial is properly granted, pursuant to Rule 59 of the Federal Rules of Civil Procedure only if the verdict is so against the weight of the evidence as to constitute a "seriously erroneous result," or "a miscarriage of justice." Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 635 (2d Cir. 2002) (citations omitted). As the standard implies, a court deciding a Rule 59 motion may weigh the evidence introduced at trial, and additionally, is not required to view the evidence in the light most favorable to the non-moving party. Id. at 634; see also Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 261 (2d Cir. 2002); DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998). Although the court is permitted to weigh the

evidence when considering a Rule 59 motion, the "weight" required to grant the motion must be so great as to allow the court to conclude that there has been a "seriously erroneous result," or "a miscarriage of justice." Id.

With respect to the issues of causation and standard of care, the court declines to order a new trial. The court views the weight of the evidence on these issues a tilting in favor of Defendants. Accordingly, the jury could certainly have reached a different result, but that is not a reason to order a new trial. Even when weighing the evidence, the court cannot hold that the verdict reached on these issues constitutes a "seriously erroneous result," or "a miscarriage of justice." Accordingly, the court denies the Rule 59 motion with respect to the issues of causation and standard of care. The court also denies the rule 59 motion to the extent that Defendant seeks to re-try the issue of damages.

As to the government contractor defense, the court reaches a different conclusion. While the court has found sufficient evidence to deny Defendant's Rule 50 motion for judgment as a matter of law on this issue, the court can make no similar holding with respect to the Rule 59 motion. The evidence supporting the government contractor defense can only be characterized as overwhelming. The amount of evidence however, is not determinative of the Rule 59 motion. Instead, the question is whether such overwhelming evidence undermines the jury verdict to such an extent as to require granting a new trial. In this matter, the court holds that it does. The court is mindful that a new trial is warranted only if the verdict reached was a seriously erroneous result, or a miscarriage of justice. The court holds here that the paucity of evidence upon which the jury apparently relied in rejecting the government contractor defense constitutes such a result.

As noted, the court has combed the record for evidence that could have been relied upon

18

to support the jury's rejection of the government contractor defense. That effort has yielded approximately eight pages of testimony ( in a transcript comprising 840 pages), offered only in rebuttal. Moreover, the rebuttal testimony relied upon conflicts with earlier testimony of the same witness, as well as testimony of a different witness with first hand knowledge on this issue. It seemed clear, prior to Plaintiffs' rebuttal case, that any private commercial business at the Site was nothing more that an idea for the future. Davenport's rebuttal testimony, which appears to contradict his earlier testimony, put this conclusion into question, referring to an ongoing commercial business operating for a not insignificant amount of time, at the same time as the government business. Allowing the jury verdict, which can only be sustained on the thin reed of Davenport's contradictory rebuttal testimony, to stand would, in the court's view, result in a serious miscarriage of justice.[3]

For the foregoing reasons, the court grants the motion pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a new trial. The new trial shall be limited only to the issue of the government contractor defense, and whether that defense is precluded because, during the relevant time period, Sylvania was engaged in both government and private business at the Site. No other matter will be re-tried, including any argument that Sylvania's breach of contract precludes it from taking advantage of the government contractor defense.

## CONCLUSION

For the foregoing reasons, the defense motions for judgment as a matter of law pursuant

---

[3] The court notes that it does not rely on the jury's notes with respect to the impact of any finding regarding the government contractor defense. The court will not speculate as to the impact of these jury questions and answers, and they play no role in the court's decision ordering a new trial.

to Rule 50(b) of the Federal Rules of Civil Procedure, is denied. The alternative motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure is granted only with respect to the issue of the government contractor defense as described herein. The Clerk of the Court is directed to terminate all outstanding motions in this matter.

    SO ORDERED.

/s/ LEONARD D. WEXLER
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       April 30, 2010